J-S14011-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOHN FRANCIS GUSTITES | : | |
| | : | |
| Appellant | : | No. 1255 MDA 2025 |

Appeal from the Judgment of Sentence Entered August 18, 2025
In the Court of Common Pleas of Schuylkill County Criminal Division at
No(s): CP-54-CR-0001362-2024

BEFORE:  KUNSELMAN, J., McLAUGHLIN, J., and BENDER, P.J.E.

MEMORANDUM BY KUNSELMAN, J.:                          **FILED: JULY 28, 2026**

John Francis Gustites appeals from the judgment of sentence imposed after a jury convicted him of third-degree murder, aggravated assault, recklessly endangering another person, and simple assault following the death of his son, John Andrew Gustites (the victim).[1]  We affirm.

The trial court summarized the pertinent facts as follows:

> The video recording of [Gustites'] statements to police was the only explanation of the events that took place.  In the interview, [Gustites] stated that he woke up that morning and heard the victim in his bedroom down the hall bothering one of his cats.  [Gustites] went to [the victim's] room to retrieve that cat, at which time the victim started asking to use a vehicle.  [Gustites] told him he was not allowed to have it, and there was some arguing back and forth.  [Gustites] took the cat and walked back to his bedroom.  He put the cat down, put a holster on his body and then took his gun and walked back to his son's bedroom.

---

[1] 18 Pa.C.S.A. §§ 2502(c), 2702(a)(1), 2705, 2701(a)(2), respectively.

[Gustites] said that he took the gun over there to shut [the victim] up. [Gustites] thought the presence of the gun would make the victim leave him alone. [Gustites] also said that once he came back to the victim's room with the gun, the victim retrieved a screwdriver from the bedpost of his bed. He said he cocked the gun, expecting the victim to back up, but he didn't. [Gustites said he] didn't remember firing. He believed the victim died right away, because he heard him gurgling. He waited all day to call the police because he debated shooting himself, but ultimately decided to call the police instead.

Trial Court Opinion, 10/17/25, at 2.

Following his arrest, the Commonwealth charged Gustites with the above crimes. Thereafter, the trial court granted the Commonwealth's request to amend the information and added a charge of involuntary manslaughter. On June 9, 2025, Gustites' three-day jury trial began and the jury began its deliberations the next day. In the afternoon of June 10, 2025, the trial court stated:

THE COURT: Good afternoon. Let the record reflect it is now 4:00 p.m. Due to an emergency, the courthouse was evacuated after the jury began deliberating at approximately 11:30 [a.m.] Fortunately, there was a room at Adult Probation to allow the jury to [continue to] deliberate.

During that time, there were two questions sent to the Court.

N.T., 6/10/25, 280-281.[2]

---

[2] Although not stated in the transcript, it appears that the jury was present for this announcement, because the court later addressed the jury's foreperson. **See infra**.

- 2 -

The trial court then had the questions marked for admission into the record and the following exchange occurred:

THE COURT: The first question was, "Why should self-defense not be considered? And simply stated, because the Judge instructed the jury it should not be considered. The jury must follow the Judge's instructions, as it took an oath to do.

A more complicated answer would be the Court has to make a decision based on the facts of the case, a legal decision, whether or not a self-defense instruction is justified. It is not in this case. So the instruction will not be given based on that legal determination.

The second question was, [t]he jury cannot come to an agreement on any of the counts. As I explained to the jury, it has not been deliberating for a significant amount of time when we look at legal time. The facts of the case are very simple. The instructions are very simple. **It's hard to imagine that if the jury applies the instructions to the facts, there's no reason why the jury would not be able to come to a decision.**

And for that reason, I instructed the jury that we would continue to work today; and if you couldn't come to an agreement by the end of the day, we will reconvene tomorrow morning.

One thing that I want to mention to the jury, just to make sure the jury is clear - - I think it is, based on the question. But the jury is able to come to a unanimous decision on certain counts and not the others. So I just want to make sure that's clear.

There are times when they can't come to a decision on, say, two of the five counts but can come to a decision on three of the five counts; and they would let me know that. If that is the case at some point, maybe we would call it a deadlock. But we're not close to being there.

So you've selected a foreperson, correct? And that's Ms. Yeastadt?

THE FOREPERSON: Yes, Mrs. Yeastadt.

THE COURT: Okay. Am I pronouncing that correctly?

THE FOREPERSON: It's Yeastadt.

- 3 -

THE COURT: Yeastadt. I apologize. And, Ms. Yeastadt, I'm correct that the jury still has not come to a unanimous decision on any counts?

THE FOREPERSON: That's correct.

THE COURT: Okay. So what we're going to do, because you guys have been hard at work and back and forth from Adult Probation, we are going to adjourn for the day. And then we're going to meet back here - - we're going to want to be ready to begin deliberations at 9:00 in Hearing Room B.

Again, the same instructions, not allowed to talk to anybody about this; don't try to do your own research. Again, come in tomorrow with a clean slate. Be willing to consider. Again, based on the instructions, based on the facts, and the fact that if you were to follow my instructions, I just have a tough time feeling that you can't come to a unanimous decision. So we're going to keep working, and we'll be back ready to deliberate at 9:00. Again, don't talk to anybody about the case. Okay?

We are adjourned.

N.T., 06/10/25, at 281-283 (emphasis added).

The next morning the trial court met with the jury in the Lawyer's room before the jury began further deliberations. The court stated:

THE COURT: I just wanted to briefly come up and talk to you before you start again today. With all the turbulence yesterday, I thought starting with a clean slate, a rested mind might help. Sometimes I forget how difficult it is to judge somebody. My kids call me very judgy, but that's different than what you have to do. You have to sit in judgment of another human being, and that can be difficult.

With that, you all did take an oath. You took an oath to do this job and also to follow all instructions whether or not you like them, whether or not you agree with them. That is the oath you took. So I just wanted to remind you of that.

I know that the murder three and the voluntary manslaughter charges can be difficult. They're not as I would write them; but they are how I had to present them to you

- 4 -

because I have bosses, the Supreme Court, that tell me I have to do that that way.

So, I often sat where Attorney Watkins and Attorney Noon were, and oftentimes I would say maybe starting with the simpler charges might be easier to navigate through and try to get a final decision.

You do have an oath to follow the instructions, to apply the law, and, again, even if you don't like the instructions that have been given or your disagree.

One of the things I need to know, if anybody here believes somebody might not be following those instructions, please let the foreperson know so that they can let me know. I can do a separate voir dire. If there is a violation of the oath, I can remove that person. We do have two alternates to replace them. Now, I hope that doesn't happen. I've never had to do that.

But if there is a violation of the oath and an intentional disregard of my instructions, that person would be disqualified, No. 1; and you have perjured yourself because you told everybody that you would take your oath and follow the instructions seriously. So I would want to know that and have that person replaced.

So, again, clean slate, maybe perhaps start with the simpler charges, apply the facts and the law. You have the law. And hopefully, you can reach a unanimous decision on all charges. And after a couple hours, we'll check in with you and see where we are. Okay?

All right, have a good morning.

THE JURY: Thank you, Your Honor.

N.T., 06/11/25, at 285-287.

After the trial court and the attorneys for the parties left the room, the

following exchange occurred in the lobby:

[DEFENSE COUNSEL]: The instructions, I believe, are in a form to coerce the jury, threatening to remove someone who is not following the rules. All of the jurors are allowed to make their own decisions based on the evidence. Their oath is their oath. I

think it's an attempt to coerce the jury one way or the other to come up with a verdict.

There's never - - the premise of what we've been dealing with the last two days is that unless you reach a verdict, you're going to stay here forever. I mean, they have not been given a charge that, [a]re you hopelessly deadlocked or - -

(A discussion was held off the record.)

THE COURT: Well, I'm going to stop you, [defense counsel]. I understand your objection and everything else. However, I don't believe they're hopelessly deadlocked. And I am simply reminding them of their oath and the instructions to try to get to a verdict. If they still come back to me and say they can't reach a verdict, if I believe they're hopelessly deadlocked, that's within my discretion.

[DEFENSE COUNSEL]: I understand. And the time is within your discretion - -

THE COURT: Yes.

[DEFENSE COUNSEL]: - - how long to keep them out.

THE COURT: Exactly. And I don't believe the hours that they've been out is even close to where I would believe that they should stop talking, especially on a murder charge.

(A discussion was held off the record).

THE COURT: So I understand the argument, but I don't believe it's - - I'm simply reminding them of their oath. And if they do violate their oath, if someone thinks that they are violating their oath, that's something to take - - if someone is not following my instructions, [defense counsel], that is something that I need to know; and I need to know why.

[DEFENSE COUNSEL]: I understand.

THE COURT: I need to know why. Now, if it's something that they simply don't believe the Commonwealth has fulfilled [its] duty, that's fine. If they think that, I need a self-defense argument, that's violating their duty because I gave them that instruction. So we would need to cross that bridge when we came to it. Okay? All right.

(A recess was taken at this time).

N.T., 6/11/25, 287-89.

Subsequently, the trial court went back on the record to discuss a note that it had received from the jury's foreperson.[3] The following exchange occurred between them:

[Q.] It states, Juror 4 believes Juror 12 is unwilling and unable to apply the law and follow the directions of the Judge.

A. Uh-huh.

Q. Do you concur in that opinion? I know it says Juror 4 - - and you're not Juror 4 - - stated that. But I wanted to ask you[.] Have you observed Juror 12 being unwilling or unable to follow the Court's instructions?

A. Yes. Juror 4 stated basically since noon yesterday that he was unwilling to deliberate or anything we could say or do wouldn't convince or change his mind otherwise. And he's bringing up things that you have told us to disregard.

Q. Like self-defense?

A. Uh-huh, correct.

Q. Is that - - is it Juror 12 or Juror 4?

A. Juror 12 is the one doing it. Juror 4 wanted me to report it on his behalf.

Q. Okay.

*Id.* at 290-91.

---

[3] In a second note, addressed to the court and jury foreperson, an unidentified juror stated that he or she "observed behavior from another [unidentified] juror that concerns me regarding the ability to follow the court's instructions. I'd like guidance on how to handle this under my oath." *See* N.T., 289-290; Joint Exhibit 3. The foreperson testified that she was not aware of the note so the court did not consider it further. *Id.* at 290.

The trial court then directed the jury foreperson to return to the jury deliberation room and ask Juror 12 to come down so the court could ask him some questions. After Juror 12 appeared, he was identified and duly sworn in to testify. The following exchange then occurred:

BY THE COURT:

Q. Mr. DeCarlo, let me cut to the chase.

A. Uh-huh.

Q. It's been reported to me by some fellow jurors that you continue to bring up a self-defense argument in jury deliberations. Is that correct?

A. I don't know how you define self-defense. I think that the - - that the Commonwealth didn't prove to me that the charges were guilty.

Q. Okay. And that's fine. Then there's nothing wrong with that. It's just been reported to me that the basis for that, at least as you've explained to your fellow jurors, is that you've been communicating the reason for that as being self-defense, which is different than the Commonwealth failing to meet its burden of all the elements of the charges.

A. I believe that [Gustites] was threatened by the [victim].

Q. Okay. Well, then if that's the reason - - because that would go to a potential self-defense, which I've instructed you not to consider; and I've instructed you not to consider anything other than what the facts are.

A. Well, to me, the facts are that the photographs of the [victim] show the screwdriver in - - next to his hand. And I also don't understand why [Gustites] - -

Q. Let me - - let me ask you a different thing because I don't want to get into your thoughts.

A. Right.

Q. My instruction specifically was that there's no justification for this, that self-defense - - and in the legal term, self-defense

- 8 -

would be justification. But my specific instruction was that the jury cannot consider self-defense.

So that should not - - that analysis should not be made by any juror whether there was any type of justification for this, but simply to analyze the elements as I outlined in the instructions whether or not the Commonwealth has proven each and every element of those charges beyond a reasonable doubt. If you're unable or unwilling to not install your own self-belief that there was some sort of justification, then we need to - - we need to find a way to get beyond that.

Q.     So I need to know from you under oath whether or not you're willing to analyze the elements without even taking into consideration any type self-defense reason. Are you able to do that or not?

A.     No, I'm not.

THE COURT: All right. So I'm finding that you're unable to follow the Court's instructions, and I am disqualifying you as a juror. And I'm going to replace you with the first alternate, which is No. 13.

N.T., 6/11/25, at 292-94.

This statement by the trial court prompted the following exchange between defense counsel and the court:

[DEFENSE COUNSEL]: Your Honor, I make a motion for a mistrial, a mistrial for the individual voir dire, interfering with jury deliberations, and pressuring nonjudicial personnel concerning their jury deliberations because you are entitled to have your opinions to yourself and make a decision of guilt or innocence. But he's not imposing it on anyone else. He's saying - -

THE COURT: He had just told me that he is unwilling to follow the Court's instructions. That's what he told me. So I'm overruling your motion for a mistrial.

*Id.* at 294. Following a recess, the jury returned with its verdict. The jury found Gustites guilty of the charges mentioned above, but acquitted him of

involuntary manslaughter. On August 18, 2025, the trial court sentenced Gustites to an aggregate term of twenty to forty years in prison. Gustites did not file a post-sentence motion. This timely appeal followed. Both Gustites and the trial court have complied with Appellate Rule 1925.

Gustites raises the following four issues on appeal:

1. Did the court err in failing to instruct the jury on the charge of justification/self-defense? The court had decided pre-trial on a Motion in Limine as to the burden the defendant must meet in order to present the defense of self-defense.

2. Did the court err in failing to consider the testimony of Trooper Keck (Trial testimony, p. 166-169) which would warrant a self-defense instruction?

3. Did the court err in determining facts that should have been left to the jury?

4. Did the judge exert overt pressure upon the jurors to render an invalid verdict? The court forced the jury to reach a verdict. (Trial testimony, p. 280-282). Although the court indicated the jury had been deliberating from 11:30 a.m. to 4:00 p.m. by the time of the convening on the jury questions (Trial testimony, p. 280).

Gustites' Brief at 4.[4]

Because Gustites' first three issues all involve the court's decision not to give a self-defense instruction, we address them together. Gustites argues that "although he produced evidence through [C]ommonwealth witnesses and their recordings to warrant the instruction for justification/self-defense, the court refused to allow the jury to consider self-defense or provide the

---

[4] When citing Gustites' Brief in this memorandum, we have inserted a hyphen whenever he uses the term "self-defense."

instruction for self-defense." Gustites' Brief at 12. Specifically, he asserts the trial court failed to consider the testimony of Pennsylvania State Trooper Ian Keck, "the recordings and additionally made factual findings that should have been left to the jury." ***Id.*** According to Gustites, the trial court's "action converted the case from a jury trial to a non-jury trial by usurping the function of the jurors." ***Id.*** We disagree.

Our standard of review involving challenges to the denial of jury instructions is well settled; our standard is "one of deference—an appellate court will reverse a court's decision only when it committed an abuse of discretion or error of law." ***Commonwealth v. Green***, 273 A.3d 1080, 1084 (Pa. Super. 2022) (citation omitted). "The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the [a]ppellant was prejudiced by that refusal." ***Commonwealth v. Sandusky***, 77 A.3d 663, 667 (Pa. Super. 2013) (citation omitted).

Moreover, as this Court has summarized:

> Before the issue of self-defense may be submitted to a jury for consideration, a valid claim of self-defense **must be made out as a matter of law, and this determination must be made by the trial judge**. Such claim may consist of evidence from whatever source. Such evidence may be adduced by the defendant as part of his case, or conceivably, may be found in the Commonwealth's own case in chief or be elicited through cross-examination. However, such evidence from whatever source must speak to three specific elements for a claim of self-defense to be placed in issue for a jury's consideration.

- 11 -

Thus, as provided by statute and as interpreted through our case law, to establish the defense of self-defense it must be shown that[:] a) the slayer was free from fault in provoking or continuing the difficulty which resulted in the slaying b) that the slayer must have reasonably believed that he was in imminent danger of death or great bodily harm, **and that there was a necessity to use such force in order to save himself therefrom**; and c) the slayer did not violate any duty to retreat or to avoid the danger.

If there is evidence from whatever source that will support **these three elements** then the decision as to whether the claim is a valid one is left to the jury and the jury must be charged properly thereon by the trial court.

**Commonwealth v. Hansley**, 24 A.3d 410, 420-21 (quoting

**Commonwealth v. Mayfield**, 585 A.2d 1069, 1070-71 (Pa. Super. 1991)

(*en banc*) (emphasis added); **see also** 18 Pa.C.S.A. § 505.

Here, at trial, after a colloquy with Gustites and upon learning he did

not wish to testify, the court explained to the parties why the evidence

presented did not warrant a self-defense instruction:

THE COURT: A valid claim of self-defense may consist of evidence from whatever source. Such evidence may be adduced by the defendant as part of his case or conceivably may be found in the Commonwealth's own case in chief or be elicited through cross examination.

However, such evidence from whatever source must speak to three specific elements for a claim of self-defense to be placed in the issue for - - placed in issue for the jury's consideration.

Thus, as provided by statute, as interpreted through our case law, to establish the defense of self-defense, it must be shown that the slayer was free from fault in provoking or continuing the difficulty which resulted in the slaying, that the slayer must have reasonably believed that he was in imminent danger of death or great bodily harm and that there was a necessity to use such force in order to save himself therefrom, and the slayer did not violate any duty to retreat or to avoid the danger.

- 12 -

I mean, the first prong, the slayer was free from fault in provoking or continuing the difficulty which resulted in the slaying by his own admission on the video, he got the cat. He went into his room. Okay. At that time, he even testified in front of - - or he told the police the fight was over.

He took it upon himself because he wasn't happy with his son and his son's mentality - - and I wouldn't be happy with my son either. But then he walked - - he went and he grabbed his .347 [sic] Magnum, walked down the hall, and went into his son's room. He's provoking the fight. He's continuing it. He's escalating it.

There's no other - - as a matter of law, that prong completely fails. And if any three of the prongs fail, I can't give the self-defense instruction.

And, I'm not so sure even B and C - - at best, with his testimony that, you know, his son did grab a screwdriver, perhaps that could be used for the voluntary manslaughter in terms of a mistaken belief. But it's hard for me to believe that anybody would have thought he was in imminent danger of death or great bodily harm based on what I heard. But maybe if any of the prongs were a fit for self-defense, that may be one of them. But if any of those three fail, as a matter, I can't give the instruction.

MR. WATKINS: So as a matter of law, you are deciding that if he brings a gun in and says, calm down, he's escalated?

THE COURT: Yes.

MR. WATKINS: Okay. That's - -

THE COURT: I don't think - - when the fight has concluded, when the fight has concluded - - and based on that, there was no yelling and screaming. Okay, any argument that took place had already happened.

There was no - - there was absolutely nothing that Mr. Gustites said in that interview that - - the language that anybody was yelling or screaming. It was done. I mean, he could have - - he could have walked down the steps. Instead, he takes a gun back to his son's room when nothing else is happening.

Now, if he was going to testify to something completely - - and this is one of the things. If he was going to testify that they

missed a lot of - - on that tape or if there was something on that video that actually supported the fact that the fight had been continuing going on, there was threats, the son was egging him on, the son - - you know, maybe it's then a question for the jury.

MR. WATKINS: Well, I believe there was testimony - - and I may be wrong - - that he said Mr. Gustites says he goes back to the room and he's demanding the car; and the argument is continuing. It is not - - it is not done when he leaves and takes the cat away.

THE COURT: Well, that's what he - - that's what the video says. The video indicates that when the argument - - when he went into the room, his son was demanding the car; and that's when he was belligerent to Mr. Gustites and angry with Mr. Gustites.

And when that argument occurred, okay, the cat will still in the kid's room - - I'm sorry - - your son's room. That's the evidence. That's what Mr. Gustites said on the tape. Okay. He left the room. He took the cat, [and] went to his own room. There was no further yelling and screaming. There was no further argument until he went back into the room with the gun.

How is that not provoking or continuing and escalating the situation? I don't think any reasonable person would believe that it wouldn't. You know, and he brings the gun into the room; and based on what he said himself, he wanted the kid to apologize for the kid's bad behavior. Well, that's, again, escalating the confrontation.

I mean, they both are living there. They both have a right to be there. But he didn't - - I mean, he made a choice to get his gun after the argument had ended and walk 10 feet down the hall to the room and go in the room. Even if it was a step, he's still going into his son's room. He could have gone downstairs. He could have stayed in his room. There was - - there was absolutely zero threats being made against him.

And even the threat of, I want that car, I want that car, it's not a - - he didn't threaten, if you don't give me that car, I'm going to slice your throat. There was no - - there was no threats of physical violence against him.

So as a matter of law - - and I'm just following - - you know, in order to get it to a jury, I have to make a - - and I know a lot

of times it's basically if there's any evidence of self-defense, it's a matter for the jury. But, I mean, this is very clear that if any of these three elements are shown, it doesn't go. And that's what [the prosecutor's] brief said, and I agree with her. But I had to wait until I heard all of the evidence to make that determination. And if Mr. Gustites - - and so right now, unless he decides to testify and his testimony is completely different than what I saw on that video, he's not getting the self-defense instruction.

N.T. 223-228.

In its Rule 1925(a) opinion, the trial court further explained why Gustites was not entitled to a self-defense instruction, and responded to Gustites' claim that it ignored Trooper Keck's testimony and usurped the fact-finding function of the jury. The court reasoned:

This court determined at the conclusion of the Commonwealth's case and at [Gustites'] decision not to testify on his own behalf, that a self-defense instruction should not be given because there was no evidence, from any source, that showed [Gustites] was free from fault in provoking or continuing the difficulty which resulted in the slaying.

***

Based upon [Gustites'] own recitation of the incident, [Gustites] provoked and continued the altercation with the victim. There was no evidence of testimony that the victim followed [Gustites] down the hall to continue his demands for the car. There was no evidence that the victim threatened him. [Gustites] even admitted that the victim did not pick up the screwdriver until he saw his father with a gun in his hand. While [Gustites] further asserts that this court erred in failing to consider all the evidence, from whatever source, he fails to specify what evidence the court failed to consider. While [Gustites] repeatedly told officers at the scene that it was self-defense and he was afraid for his safety, this generalized statement does not fit all of the prongs necessary for the court to be able to present the instruction to the jury. The only evidence we have of what took place in the moments before the shooting are [Gustites'] own words in his interview.

Next, [Gustites] cites that the court erred in determining facts that should have been left for the jury. First, [Gustites] cites that the court stated that it was hard to believe that anybody would have thought he was in imminent danger of death or great bodily harm from the evidence presented. While the court stated its doubts on where there was satisfactory evidence of the second prong, the court made clear that it only denied the self-defense instruction on the basis of the first prong regarding provocation, not whether [Gustites] reasonably believed he was in imminent danger of death or great bodily harm. [Gustites] also asserts that the court made a factual determination in disregarding testimony that the fight had not concluded at the time of the shooting, However, [Gustites] does not cite to who offered this testimony. No one could have offered testimony regarding what happened except for [Gustites] in his interview regarding the fight. The court properly considered all evidence presented.

Trial Court Opinion, 10/14/25, at 2-3 (excess capitalization omitted).

Our review of Gustites' video statement supports the trial court's conclusions. As noted above, the only evidence introduced into the record about how the shooting occurred was Gustites' interview with Trooper Keck. While the trooper admitted on cross-examination that Gustites stated various reasons why he feared the victim, and that he only cocked the gun to scare him, these facts concern the second prong of a claim of self-defense, which the trial court did not rely on when refusing to give the instruction. *See* N.T., 6/9/25, at 166-69.

Moreover, the trial court refused to give the self-defense instruction based upon its conclusion that Gustites provoked and continued the incident by introducing deadly force into a verbal altercation; as noted by the trial court, Gustites' fear of the victim would be relevant to the unreasonable belief or imperfect self-defense involuntary manslaughter charge, for which the jury

acquitted him.  *See generally, Commonwealth v. Austin*, 906 A.2d 1213 (Pa. Super. 2006).

Within his brief, Gustites makes additional arguments that are unavailing.  Although Gustites asserts he could "find no basis to instruct the jury that they cannot hold the failure to show the entire video against the Commonwealth," Gustites' Brief at 17, the trial court provided a neutral instruction to the jury that no negative inference should be made against either party.  *See* N.T., 6/9/25 at 163 (trial court informing the jury that no negative inference should be made to either party because the entire three-hour video was not played; portions of the video may have "irrelevant stuff in there that really doesn't pertain to whether or not the Commonwealth can prove the elements of the crime.  [Defense counsel] certainly will have the right to play anything that he thinks is relevant at the appropriate time").  Gustites did not present any portions of the video.

In his brief, Gustites repeats his claim that "there had been testimony offered that the fight had not concluded at the time of the shooting," Gustites' Brief at 19, he provides no specific citation to any witness' testimony or his statement to Trooper Keck.  Similarly, his general claim that the "court failed to consider any other testimony offered by the body cams and the police," without citations to the record, merits no relief.  *See Commonwealth v. Tielsch*, 934 A.2d 81, 93 (Pa. Super. 2007) (holding that undeveloped claims will not be considered on appeal).

In sum, Gustites' first three issues fail for lack of merit.

In his fourth and final issue, Gustites asserts that the "court continually coerced the jurors to find a verdict contrary to their individual beliefs." Gustites' Brief at 12. To support this claim, Gustites notes that the court requested the jurors to report other juror's "misbehavior that would require the juror's removal," and when this occurred and the juror stated that self-defense should be considered he was removed. *Id.* According to Gustites, "[t]his is violative of the purpose of the jury trial by a jury of your peers. Your peers are able to consider what they believe the circumstances present as opposed to the judge telling them what [the] circumstances present." *Id.* We disagree.

Regarding our review of a trial court's decision to disqualify a juror, this Court has summarized:

> The decision to discharge a juror is within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. This discretion exists even after the jury has been impaneled and the jury sworn. The common thread of the cases is that the trial judge, in his sound discretion, may remove a juror and replace him with an alternate juror whenever facts are presented which convince the trial judge that the juror's ability to perform his duty as a juror is impaired.

***Commonwealth v. Marrero***, 217 A.3d 888, 890 (Pa. Super. 2019) (citations and internal quotations omitted). ***See also*** Pa.R.Crim.P. 645(a).

Here, the trial court explained its actions during the jury's deliberations and why it removed Juror No. 12:

[Gustites] asserts that the court erred in "pressuring" the jury and eventually, replacing Juror Number 12 after an in-court colloquy. On the first day of deliberations, the court received a question from the jury fairly quickly, asking why they were not allowed to consider self-defense. First, the only reason self-defense had to be discussed was because [Gustites'] trial counsel improperly raised it in his opening statement before this court had determined whether or not it would go to the jury for consideration. Naturally, this then presented confusion for the jury to understand why it could not be considered. The court explained to the jury that it was a legal determination that they were not to consider, and it was to be completely disregarded in their deliberations. The court emphasized the "simplicity" of the case in terms of, analyzing the elements of each crime and determining whether the evidence fit those elements and proved the crimes beyond a reasonable doubt, without any further complications of analysis of self-defense.

The jury remained unable to return a verdict on all charges, including simple assault, despite an admission by [Gustites] that he killed the victim, and the court was concerned that self-defense was still being considered in deliberations. Due to this, the court reminded the jury on the second day of deliberations that they took an oath to follow the court's instructions, even if they disagreed with those instructions. Subsequently, two separate notes were provided to the court stating that a particular juror could not follow the oath. This court had an in-court colloquy, in which Juror Number 12 did not say that he had a reasonable doubt at whether any of the crimes occurred; rather, he stated he believed [Gustites] had reason to shoot and kill the victim. It was clear this was a juror who could not follow the court's instructions, and was dismissed and replaced by an alternate.

\*\*\*

[A] refusal to deliberate or follow instructions is sufficient grounds for dismissal. ***Commonwealth v. Nieves***, [242 A.3d 407 (Pa. Super. 2020) (non-precedential decision at \*3)]. In ***Nieves***, the foreperson informed the court that a juror was refusing to deliberate or follow the instructions provided by the court. ***Id.*** The court colloquized the juror at length, and determined the juror refused to deliberate on the charge of murder in the third degree, and replaced the juror with an alternate. ***Id.*** This decision was upheld by the Superior Court, as it was within the discretion of the trial court to disqualify the juror

based upon her refusal to apply the law, deliberate, or render a verdict in accordance with the evidence. *Id.* While this case is an unpublished decision, the facts in this case are almost identical. Juror Number 12 refused to apply the law and render a verdict in accordance with the evidence. It was within this court's discretion to disqualify the juror on this basis. Coercion and overt pressure did not take place, rather; the court was focused upon ensuring a lawful deliberation was taking place in which all jurors were abiding by the oath they took as jurors. It is the court's duty to instruct the jury on the law. This duty continues until a verdict is rendered. The court takes this duty seriously, as the remedy of a verdict is [preferable] to a mistrial.

Trial Court Opinion, 10/14/25, at 5-7 (excess capitalization omitted).

Our review of the trial transcript as recited above, supports the trial court's conclusion that it properly exercised its discretion in removing and replacing Juror No. 12. Like the trial court, we find this Court's ***Nieves*** decision to be persuasive. ***See*** Pa.R.A.P. 126. Here, the trial court asked Juror No. 12 whether he was able to analyze the elements of the crimes charged without considering any type self-defense, and he said he could not. This answer established that Juror No. 12 could not follow the court's instruction. Gustites' assertions that the trial court "committed fundamental error by repeatedly coercing the jury to reach a verdict and not consider any evidence in indicating justification" and that court's "targeting a dissenting juror [was] impermissible coercion" is refuted by the record as well as the pertinent case law cited above. Gustites' Brief at 21-22.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>7/28/2026</u>